**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|                                              |     |                           |
|----------------------------------------------|-----|---------------------------|
| CHERYL WILLIAMS,                             | )   |                           |
|                                              | )   |                           |
| Plaintiff,                                   | )   |                           |
|                                              | )   |                           |
| v.                                           | )   | Civil Action No. 14-1290  |
|                                              | )   | Judge Nora Barry Fischer  |
| PENNSYLVANIA HUMAN RELATIONS                 | )   |                           |
| COMMISSION, JOSEPH RETORT, ADAM              | )   |                           |
| STALCZYNSKI,                                 | )   |                           |
|                                              | )   |                           |
| Defendants.                                  | )   |                           |

## MEMORANDUM OPINION

I.     INTRODUCTION

This case involves an employment dispute between Plaintiff Cheryl Williams ("Plaintiff" or "Williams") and her former employer, the Pennsylvania Human Relations Commission ("PHRC"), her former supervisor Joseph Retort ("Retort"), and the former Regional Director of the Pittsburgh Office of the PHRC ("Pittsburgh Regional Director"), Adam Stalczynski ("Stalczynski").   Remaining from her Amended Complaint, (Docket No. 10), are her claims for discrimination alleging that she suffered a hostile work environment and/or was constructively discharged based on race, gender, and disability.   Presently pending is the Motion for Summary Judgment filed by Defendants (Docket No. [52]), and Plaintiff's opposition thereto. After reviewing the filings of the parties, including the Amended Complaint (Docket No. 10); Defendants' Motion for Summary Judgment, Brief in Support, Concise Statement of Undisputed Material Facts and Appendix thereto (Docket Nos. 52, 53, 54, 55); Plaintiff's response in opposition delineated as her "Motion in Opposition to Defendant's Motion for Summary

Judgment," (Docket No. 56), her Brief in Opposition and her Response to Defendant's Concise

Statement of Undisputed Material Facts (Docket Nos. 57, 59); Defendants' Reply Brief (Docket

No. 61) and Plaintiff's Sur-Reply Brief (Docket No. 62); and the parties' evidentiary submissions,

and considering the record as a whole against standards for granting such a motion under Federal

Rule of Civil Procedure 56, the motion will be granted for the following reasons.

II.    PROCEDURAL HISTORY

In November 2013, Williams filed a charge of discrimination ("Charge") with the EEOC.

(Docket No. 54 at ¶ 15; 59 at ¶ 15).    A right to sue letter was issued by the EEOC on July 9, 2014.

(Docket No. 10-1, Exs. B and C).    On September 22, 2014, Williams commenced this action

originally only against the PHRC.    (Docket No. 1).    On order of this Court, she filed her

Amended Complaint on November 21, 2014, then adding Defendants Retort and Stalczynski to

her suit against the PHRC.    The Amended Complaint sued the PHRC under Count I for violation

of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.*; sued the PHRC under

Count II for violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e; sued the

PHRC under Count III for violation of the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. §§

951-963; and sued Defendants Retort and Stalczynski under Count IV pursuant to 42 U.S.C. §

1983 for violation of rights secured by Title VII, the ADA and the PHRA.    (Docket No. 10).

On December 3, 2014, the PHRC filed a partial motion to dismiss, seeking dismissal of

Counts I and III in their entirety and the portion of Count II alleging violations of the PHRA.

(Docket Nos. 12, 13).    By memorandum order dated January 14, 2015, the Court dismissed

Counts I and III with prejudice as to the ADA and ADEA claims and dismissed Counts I, II and III

without prejudice to Plaintiff to refile in state court as to the PHRA claims brought under those

counts. (Docket No. 15). Thus, claims remained only under Count II against the PHRC for violation of Title VII and under Count IV against Retort and Stalczynski under § 1983. On January 22, 2015, Plaintiff sent to Defendants Retort and Stalczynski a Waiver of the Service of Summons, which they returned on January 23, 2015. (Docket Nos. 18, 19). The PHRC filed its answer to the remaining claims against it in the Amended Complaint on January 26, 2015, (Docket No. 16), and Defendants Retort and Stalczynski filed their answer to the claims against them in the Amended Complaint on March 24, 2015. (Docket No. 20). With leave, on August 11, 2015, Defendants Retort and Stalczynski filed an Amended Answer to the Amended Complaint. (Docket No. 35). On February 16, 2016, Defendants Retort and Stalczynski filed a motion for partial judgment on the pleadings, which the Court denied without prejudice on April 3, 2016 (Docket No. 40, 47). Discovery closed on April 18, 2016. (Docket No. 46). With leave, the Defendants filed a consolidated and second Amended Answer to the Amended Complaint on April 26, 2016 (Docket No. 51). Thereafter, Defendants filed the present motion for summary judgment. (Docket No. 52).

III.    FACTUAL BACKGROUND[1]

Williams is an African-American female. (ASOF ¶ 1).[2] She was employed by the PHRC in the early 1990's, and returned to the PHRC from other employment beginning in September 1999. (ASOF ¶ 2). She transferred from the Harrisburg office of the PHRC to the Pittsburgh office in or about February 2010. (Docket No. 55-14 at 14, 29). Williams also served as Chair of the Union, represented PHRC investigators, and was the chief negotiator for all of the

---

[1] For purposes of summary judgment, the facts are construed in the light most favorable to Williams and are drawn from the undisputed facts in the Concise Statement of Material Facts, the undisputed evidence in the record, and facts as additionally indicated by Williams in her response to the Concise Statement of Facts and supported by evidence in the record.

[2] Defendants' Concise Statement of Undisputed Material Facts, (Docket No. 54), as admitted in Plaintiff's Response to Defendants' Concise Statement of Undisputed Material Facts, (Docket No. 58), is cited to herein as "ASOF ¶ __".

investigators regarding the terms and conditions of their work. (Docket Nos. 57-4 at 16; 57-2 at 11, 15). She last was physically present at work for the PHRC on August 9, 2013 when she advised Stalczynski by email that she was ill and leaving for the day. (Docket No. 10; Exhibit 1, Exhibit 10; Docket No. 57-1 at 13) (ASOF ¶ 2). She formally resigned from her employment with the PHRC on January 15, 2014. (ASOF ¶ 3). At the time, she was employed full-time by the PHRC as a Human Relations Representative 2. (ASOF ¶ 4).

From the time she worked for the PHRC in Pittsburgh in 1999 until 2011, the Regional Director in charge of the Pittsburgh Office was George Simmons ("Simmons"), an African-American male. (ASOF ¶ 21). The Regional Director is responsible for supervising all of the office, including investigations, fact findings, intake and training. (Docket No. 55-14 at 10). In 2011, Simmons retired and Terrence McDaniel, an African-American male, became the acting Regional Director in Pittsburgh, serving until December 2012 when Stalczynski, a white male, became the Regional Director in Pittsburgh. (ASOF ¶ 22). Stalczynski was first employed by the PHRC in December 2012 and worked as the Regional Director in Pittsburgh until he left in January 2015 to take a job as the Director of Operations and Management for the Peace Corps in Benin, West Africa. (Docket No. 57-11 at 6-8). Thus, Williams worked with Stalczynski for a little over seven (7) months from December 2012 until she left the office on August 9, 2013. (Docket No. 57-1 at 130-132; 55-9 at 7). At the time she left, her direct supervisor was Retort, a white male who had been her supervisor since 2010, except for a short time when Kathleen Wilkes was her supervisor on Williams' request. (Docket Nos. 54 at ¶ 23; 59 at ¶ 23; 57-1 at 54-56).

Shortly after she returned to work for the PHRC in 1999, a minority contractor that Williams had interacted with in her previous work for the Department of General Services informed her that in a meeting that Williams was not involved in, Simmons had referred to her as

an "aggressive female" and "a troublemaker." (Docket No. 57-1 at 65-67).

In March of 2009, Williams was suspended in an incident involving Ellen Surloff, who was assistant chief counsel at the PHRC and a supervising attorney, (Docket No. 55-14 at 59), and Mike Hardiman, another PHRC attorney. (Docket No. 57-18 at 61-63, 57-20 at 33-44, 72, 57-3 at 35). Williams was suspended without pay for five days for objecting to PHRC attorneys attending the PHRC fact finding conferences and allegedly cancelling a conference to prevent the PHRC attorney from attending; however, she actually had cancelled the conference because the case settled, and ultimately, the practice of attorneys attending the fact finding conferences did not last long, ending by early 2010. (Docket Nos. 57-18 at 61-63; 57-20 at 33-44, 72; 57-3 at 35). Thus, Williams' suspension resulted from improper and false allegations by Surloff against her.

Retort again became Plaintiff's supervisor during the 2009-2010 review period, taking over from Kathleen Wilkes. (ASOF ¶ 34). Retort's responsibilities as a supervisor included overseeing the work of investigators, helping them manage their caseload, and reviewing their recommendations as to probable cause. (Docket No. 55-14 at 10). In 2010, Retort put Williams on a performance improvement plan ("PIP") for a few weeks based on his review of her work for a period during which, in part, he did not supervise, and Williams successfully completed the PIP. (ASOF ¶ 35); (Docket Nos. 55-3 at 35; 55-14 at 58). Williams indicated in an email that she refused to sign any PIP issued by Retort. (Docket No. 55-11 at 5). Williams also claimed Retort's review of her was in violation of the bargaining unit agreement because Retort had only supervised her for a portion of the period beginning on February 15, 2010. (Docket Nos. 54 at ¶ 32, 59 at ¶ 32, 57-1 at 140-141; 57-3 at 17). No further employee performance improvement plans were ever put in place regarding Williams. (ASOF ¶ 36). Retort also regularly disagreed with Williams' finding of probable cause in cases of discrimination filed with the PHRC and purportedly held her

cases longer than others.   (Docket Nos. 54 at ¶ 32, 59 at ¶ 32, 57-1 at 140-141; 55-14 at 63).

Sometime in or about April and May of 2011, when Williams was complaining to Simmons about Attorney Surloff, as Williams was leaving Simmons' office, Surloff extended her arms to stop Williams from leaving and when Williams went to leave Surloff swung her arm and hit Williams. Williams then asked Surloff again to move so she could leave and Simmons told Surloff to move and let Williams leave.   (Docket No. 57-3 at 28-30).   Williams insists that Simmons witnessed Surloff hitting her; instead he denied it. (Docket No. 57-3 at 28-30).   At some time prior to his departure from the PHRC, Simmons, also threatened to hit Williams. (Docket No. 57-3 at 30).   Williams' co-worker, David Jones observed Simmons, (who is taller and bigger than Williams), was "nose to nose" with Williams stating "I'm not afraid of you, I'll hit you."   (Docket No. 57-19 at 41; Docket No. 57-3 at 31).

Near the end of 2011, PHRC personnel came to the Pittsburgh office for the stated reason that the PHRC Executive Director wanted to introduce a new personnel office employee to the Pittsburgh Office, but Williams believed that the real reason was an investigation directed at her based on an assertion that PHRC Executive Director, JoAnn Edwards ("Edwards") had been told by a female attorney in Pittsburgh that Williams had told a fellow employee to stop closing cases. (Docket Nos. 59 at ¶ 24; 57-1 at 118-123).   Williams inferred an investigation because: there was no conference introducing the new personnel employee to everyone, and instead only select individuals, including Williams and other African-American employees, were called into private meetings in the conference room; these employees were asked questions regarding performance and quickly closing cases; and Edwards subsequently apologized for the PHRC personnel employees not truthfully indicating the reason they were coming to Pittsburgh.   Williams denied ever instructing anyone to stop closing cases.   No action was taken against Williams for the

alleged statement regarding case closings, because, according to Williams, she uncovered what they were doing; reported it to Edwards; Edwards asked Williams to investigate although Edwards allegedly knew what "really" was going on; and Williams completed an investigation followed by a report which was submitted to Edwards and the Commissioners. (Docket Nos. 59 at ¶ 24; 57-1 at 118-125).

In 2012, Williams' co-worker David Jones overheard a female PHRC attorney, (Docket No. 57-19 at 39), speaking with Retort and referring to wanting Williams fired and commenting to Retort that "she's such a bitch, now I know why her husband left." (Docket No. 57-10 at 39-40). The attorney also commented that she did not like Williams, Williams was not doing her job and that she bullied people. (Docket No. 57-10 at 40).

For a brief time in 2012 when he supervised Williams regarding a pilot program, Robert Flipping, another PHRC supervisor, was instructed to document what all of his employees did, (Docket No. 57-21 at 47), and was asked by Stalczynski to write Williams up for anything that was amiss in her caseload. (Docket No. 57-21 at 49-50). Flipping claimed that because he did not have time to review everyone's cases, including Williams' cases, and needed to focus on intake and his education and community services responsibilities, that as a result his former commendable and outstanding employee performance review in 2012 declined to a very poor and dismal review under Stalczynski, (Docket No. 57-21 at 50-51), resulting in a 90-day action plan that Flipping did not complete because he instead quit. (Docket No. 57-21 at 51).

Williams believes that after Stalczynski began working at the PHRC at the end of 2012, he exhibited a bias against her which she attributed in part to her being an African-American female, (ASOF ¶ 27), because he sometimes would "rudely" roll his eyes and suck his teeth when she spoke to him and when she would say something he would assume it was incorrect. (Docket No.

59 at 4; 57-1 at 131-134). On one occasion Stalczynski asked Williams to complete an FMLA form which he said was requested by the administrative office of PHRC in Harrisburg and when she said that she did not have to complete it and that HR was incorrect, he disagreed with her stating that if the personnel people in Harrisburg at PHRC told him she needed to do this then they were probably correct. (ASOF ¶ 29); (Docket No. 57-1 at 132-134). Stalczynski apparently also exhibited behavior that plaintiff perceived to be "hostile" when she disagreed with a position in staff meetings about work procedure. (ASOF ¶ 30). At one such staff meeting, Williams arrived approximately seventeen (17) minutes late due to her leaving for a chiropractic appointment on her break, and when she immediately chimed in with her views on the work topic, Stalczynski remarked that if she had been on time she would have realized that her comments were out of context and disruptive. (ASOF ¶ 31). Stalczynski also avoided talking to Williams and did not offer condolences when Williams returned to work after her nephew and aunt had passed away. (Docket Nos. 59 at 31; 57-1 at 135-136).

In May of 2013, Stalczynski sent an email to Plaintiff asking her to meet with him so he could prioritize her work. Williams responded by asking if Stalczynski planned to meet with other employees to prioritize their work as well, and he responded that she was the only one, (ASOF ¶ 39), and that she seemed to be having a problem doing her work based on input from Joe Retort. (Docket Nos. 55-3 at 33-34; 57-4 at 22). Nevertheless, Williams never met with Stalczynski to prioritize her work. (Docket No. 55-4 at 72).

At one point, the PHRC employed a "root process" that was targeted at closing older cases. (Docket No. 55-14 at 51; Docket No. 57-2 at 10-13). A directive was given for the regional directors to close older cases. (Docket No. 55-14 at 51). Retort explained that the root process was a process whereby 25 older cases within an individual investigator's caseload were collected,

the regional director, supervisors and assistant chief counsel reviewed them, then management staff discussed them, and then management staff met with the individual investigator in an attempt to get the older cases "moving" and closed. (Docket No. 55-14 at 49). The age of cases was one of the factors used to rate the regional directors. (Docket No. 55-14 at 49). Retort testified that the root process was not a punishment (Docket No. 55-14 at 49), and that he determined that Williams did "a very good job of taking care of those cases" in the root process and relayed that to the PHRC's central office. (Docket No. 55-14 at 51). She had been through the root audit process once and was scheduled to go through it again prior to her leaving in August of 2013. (Docket No. 57-2 at 20-23). She believed they were putting her on a second root audit process to keep her "out of things" as she would be busy closing cases and that she was to be put on it a second time when others had not been through it the first time "because she complained about the root process not working on behalf of the union." (Docket Nos. 57-2 at 23-25; 59 at ¶ 37).

On May 29, 2013, Williams and Stalczynski exchanged emails regarding call-off procedures, (Docket No. 55-11), and Williams had the Executive Director review the matter at her request. (ASOF ¶ 43). Yet, no action was taken against Williams. (ASOF ¶ 43). The email chain began with an email from Stalczynski providing:

> Cheryl—I have noted your absence from the office yesterday Tuesday May 28th and today May 29th but you have not made any effort to call off your absence per the attached policy.
>
> As you know we anticipated your submission of your ROOT case summaries today and have your ROOT meeting scheduled for 9AM tomorrow morning. However, because you have been absent, I am uncertain as to whether you expect to furnish these summaries or if we are to still move ahead with the ROOT meeting as planned.
>
> Please advise us then regarding your absences once you see this.

(Docket No. 57-13). Williams then responded, in part:

> Adam, I am completely aware of the reporting off policy which I have been
> adhering to for the 15 years that I have been employed in the Agency. Joseph
> Retort is my immediate supervisor and I did inform him that I would be absent from
> the office due to illness as I always do. So for you to state as a matter of fact that
> "you have not made any effort to call off your absence per the attached policy" is
> inaccurate and untrue and another example of what I am referring to as your
> harassing behavior toward me, bullying and intimidation approach to managing my
> employment.
>
> As you may not know, I am not responsible for performing work when I am not
> actually able to report to work. I am not a salary employee but instead I am a
> bargaining employee. If I have been absen[t] from the office, why should I be
> expected to perform work? Finally, you are not my direct supervisor, I don't
> understand why you don't have an issue with giving directives directly to me not
> apparently knowing what communications take[] place with myself and my
> immediate supervisor. Has my report now changed to you for some reason and if
> so what is the reason for this change that is not consistent with the labor
> management organization structure?

(Docket No. 57-13). Williams explained that she would be off from work until June 7, 2013 due

to a medical condition, that "this information was left on [her] immediate supervisor's voice mail,"

(Docket No. 57-13), and that she had learned her immediate supervisor was out of the office on

May 28, 2013, and that if he has not returned she would forward information directly to personnel

instead. (Docket No. 57-13).

Williams took the email as an insult because Stalczynski did not engage in a cordial

conversation with her, addressed the issue in an email in a manner she considered to be rude, and

Stalczynski likely knew that Williams was actually the one who had helped to negotiate the

call-off procedure as the chief negotiator for the union. (Docket No. 59 ¶ 41; 57-2 at 55-57;

57-13). Williams indicated that she:

> was the elected union person and [] had been the chair responsible for negotiating
> terms and conditions for all of the investigators for 8 years and I was the shop
> steward for 13 years. If there was anyone who should have followed the rules, it
> was me. I was the one that knew all the rules, knew all of the policies and I

adhered to them.   Plus, it wasn't his position—in my opinion it wasn't his position because he was not my direct supervisor.   I reported to Joe Retort.

(Docket No. 55-4 at 6).   Stalczynski testified that it was his job to ensure that employees were adhering to the time and attendance policy regardless of Williams' stated contention that it was not his job to do so and that he intended to clarify to her that she had an obligation to contact the Regional Director when the direct supervisor was out.   (Docket No. at 55-10 17-18).

In June of 2013, Williams walked into the office of her direct supervisor, Retort.   Because she can read upside down, while she was talking to him she noticed that he was "completing some questions about [her]."   (Docket No. 55-4 at 7).   She inquired of Retort:

"Why are you completing questions about me?"   He said, "I don't think I can discuss that with you."   I said, "Who instructed you?"   He said that he had gotten a directive from higher up and he was just answering some questions and he couldn't discuss it with me." [Then she] contacted HR and asked them if they knew if there was some investigation taking place regarding me.   The HR person was evasive in his answer.   He says, "There is just some information that we are trying to find out and perhaps we will discuss it with you at some other time."   I never heard anything and I think I found out what they were doing.

(Docket No. 55-4 at 7-8).   Although she was never called to respond in any investigation, she determined from these facts that she, in fact, was being investigated. (Docket No. 59 at ¶ 44).

Around July 26, 2013, Plaintiff took time off from work and even though Plaintiff followed the established process for taking time off, Stalczynski decided to confront her, accusing her of violating policy in a counseling memo dated August 6, 2013.   The memo stated that "[i]n the future, per the Reporting Off and Unscheduled Absences From Work Policy, you are required to notify and have approval from your supervisor to take leave before leaving the office.   If your supervisor is not available, you must contact me for the required approval."   (Docket No. 55-12 at 2).   No disciplinary action was ever taken as a result of this call off instance. (ASOF ¶ 45).

Williams claims that in July of 2013 Retort and Stalczynski engaged in conduct to "harm" her. (Docket No. 57 at 13; Docket No. 55-4 at 8). She testified that she overheard a conversation that took place behind closed doors after a team meeting. Williams explained that in the team meeting "we were discussing some things that [Retort] just had a problem with me having questions about." (Docket Nos. 55-4 at 8). Williams elaborated that:

> [o]f course, during those meetings I always had questions. I am just that kind of person. If I don't understand something, I will question it. . . . If I believe that what they were doing was not correct and I had documentation to show that it wasn't, then I would elaborate on that.

(Docket No. 55-4 at 9).

Williams admitted that she had issues with who was supposed to be in those team meetings and had sent an email to Edwards inquiring as to why Stalczynski as the Regional Director would be in team meetings and if Edwards had instructed Stalczynski to be in the team meeting. (Docket No. 55-4 at 9). After the team meeting, Williams overheard Stalczynski and Retort talking about her at which time Stalczynski stated to Retort "What is Cheryl's problem?" To which Retort responded, "I don't know. . . . I believe that she thinks she is a legend in her own mind." (Docket No. 55-4 at 8, 10). Stalczynski then stated "What are we going to do about this?" Retort responded: "Well, we can transfer her out of compliance and put her into intake. The new investigator, Manuel Zanaga, we can put him in compliance." (Docket No. 55-4 at 10). Williams indicated that she was bothered and upset by what she described as hearing them "plotting" about her. (Docket No. 55-4 at 10). She also testified that Retort referred to her in this conversation as "a legend in [her] own mind because of the issues that [she] was champion[ing] regarding the union." (Docket No. 55-6 at 16) <u>see also</u> (Docket No. 55-4 at 9) She added that she could overhear conversations in Stalczynski's office and at one time even sent the regional director

an email telling him "I can hear everything you guys are saying; so if you believe that you are talking confidentially, you are not.   Maybe you want to take it to a conference room."   (Docket No. 55-4 at 9-10).   A transfer to intake,[3] however, never occurred, (Docket No. 55-14 at 57), and the matter never involved any intent to physically harm her.   Williams immediately emailed Edwards to report the conversation, to which Edwards responded with an apology but nothing else to help Williams regarding this incident.   (Docket No. 57-1 at 158-160).

Williams and her Regional Director exchanged emails on August 5, 2013 regarding a prior leave request.   The chain began with an email from Stalczynski to Williams indicating that a leave request had been reviewed and processed.   (Docket No. 57-5).   Williams explained in her deposition that the request was for leave in July of 2013 and to her understanding it already had been approved by Retort as her direct supervisor.   Williams responded to her Regional Director with an email instructing:   "I don't understand why you are reviewing and approving my leave. This should be done by my immediate supervisor unless you have become my immediate supervisor.   Please clarify."   (Docket No. 57-5).   Stalczynski responded "Let's meet with Joe in my office and I will explain.   Please come by once you both are available."   (Docket No. 57-5). Williams then pointedly responded "I don't want to meet with you [or] Joe to hear an explanation. It's a simple question[] if you can't give me a simple response by email.   Then I will inquire from HR."   (Docket No. 57-5).   Williams testified that after the email chain, her regional director approached her at her desk and yelled, "In my office right now!"   (Docket No. 57-3 at 77).   At the time, she was sitting at her desk with her headphones on listening to music and filling out

---

[3] Retort did not view a transfer between intake and compliance as a demotion as both were equally important in processing cases, (Docket No. 55-14 at 53), however, some employees would complain if they were transferred from compliance to intake, even though others specifically had requested a move to intake. (Docket No. 55-14 at 53-54).

paperwork. (Docket No. 57-3 at 77).[4]   When she realized Stalczynski was behind her, Williams

turned to Stalczynski, took her headphones off and spoke with him.   (Docket No. 59 at ¶ 48).   As

part of the exchange, Williams stated to Stalczynski that she did not need an explanation from him,

heard him say "Oh, okay" and then put her headphones back on. (Docket No. 59 at ¶ 48).   After

the interchange, Stalczynski wrote her up for insubordination as well as inappropriate and

unprofessional conduct. (Docket Nos 55-12 at 4; 59 at ¶ 48).

In a contemporaneous email to Joanne Doane, Williams stated that Stalczynski appeared

disturbed when he approached her at her desk, that she took off her headset and:

> he motioned with his hand, and said, "let's go to my office."   I told him Adam I am
> working on something that I need to finish, he said you don't want to meet with me
> and I said, no it's not necessary.   He was quite disturbed and said are you
> disobeying me, I said no I am not, I initiated the contact and I don't want to discuss
> it in your office, so its [sic] ok.   I need to finish what I am working on.   I then
> turned and continued to work on the statement I was working on.   He walked
> away.
>         This is another example of Adam, trying to bully me and I have grown tired
> of it.   That was not necessary!!!!! I am sure that he will try to suggest that I was
> insubordinate.   I however was not and I am not going to be talked to as if I am a
> child, nor will I be bullied by anyone!!!!!!!!!!!!!!!! What occurred here was
> unnecessary and completely disrespectful of me and my rights.

(Docket No. 57-5).

The subsequent August 8, 2013 *pre*-disciplinary conference ("PDC") notice from

Stalczynski to Williams scheduling a conference for August 13, 2013 on the matter stated:

> Specifically, on August 5, 2013, at approximately 8:30 a.m., you were
> directed by the Regional Director to participate in a meeting with the Regional
> Director and your supervisor.   It is alleged that you not only refused to attend the
> meeting, but also placed ear buds in your ears to ignore the attempts at
> communication and direction.
>         It should be noted that corrective action *may or may not* result from this
> PDC.   A union representative may be present during this conference in order to

---

[4] Apparently, the paperwork Williams was working on involved an internal complaint by Williams against
Stalczynski alleging harassment.   (Docket No. 57-3 at 77).

clarify questions posed to you and to summarize your statements. You have a right to waive this opportunity for due process; however, in the event that you do not report for and/or waive the scheduled PDC, management will proceed with a decision based on the information presently at hand. You will be notified, in writing, as soon as possible as to whether or not disciplinary action will be taken.

(Docket No. 55-12 at 4) (emphasis added).

Williams never experienced any change in her work assignment, change in her hours or location of her employment in 2012- 2013. (ASOF ¶ 50).

While working for the PHRC, Williams had asked for a series of accommodations, including voice activated computer software; a telephone headset; a raised monitor; a trackball mouse; and a footstool. (Docket No. 57-3 at 59-64). She said that the software and headset did not work properly, she complained, and nothing was done. (Docket No. 57-3 at 60, 62-63). At one point the PHRC had purchased an adjustable height desk for her and when the office relocated to "Piatt Place" in 2010, it was placed in Simmons' office. (Docket No. 57-3 at 66-67, 69). Then she had a modular desk that did not allow for her to stand and work. (Docket No. 57-3 at 66-67, 69). When they moved the office she requested her previous work station set up, (Docket No. 57-3 at 69-70), but they did not provide it to her. (Docket No. 57-1 at 178-179). At one point Stalczynski told Williams that she could have the adjustable height desk being stored in his office, but she responded it would not fit into her work station. (Docket No. 57-2 at 36-37). She admittedly did not follow up with Stalczynski regarding the desk, because as she testified: "Why, I had been doing it for freaking 11 years, a whole decade. They knew that I needed to be accommodated. . . . Everyone knew it so why the H-E-L-L did I have to continue to ask them to give me accommodations that they knew that I needed that my medical documentation told them." (Docket No. 57-2 at 37). Williams contends that the refusal to accommodate her was discriminatory treatment because, in addition to not accommodating her, the PHRC did not

accommodate an African-American Supervisor, Flipping, who needed an individual heater in his office or a move to a warmer office when he was recovering from spinal surgery and was suffering with arthritis, yet the PHRC accommodated a white employee who "had some disability" by giving him clearance to work from home.   (Docket No. 57 at 9; Docket No. 57-21 at 9-13, 23-24).

   After leaving work on August 9, 2013 and not returning, Williams submitted a Family Medical Leave Act ("FMLA") request dated August 16, 2013 seeking leave from the PHRC effective from August 12, 2013 to an indefinite date and stating that she had a work-related injury and would be unable to work indefinitely due to her diagnosis.   (Docket No. 57-10).   The request specifically set forth that she had leg pain and diffuse muscle aches from fibromyalgia.   *Id.*[5] Williams was granted FMLA leave from August 12, 2013 through February 2014. (ASOF ¶ 5).

   Williams also requested unemployment compensation benefits on September 8, 2013, which were denied by the Department of Labor and Industry under section 402(b) of the Pennsylvania Unemployment Compensation Law, 43 Pa. Stat. § 802(b), which provides for ineligibility where a claimant voluntarily leaves work "without cause of a necessitous and compelling nature." (Docket No. 55-12 at 49, 51); 43 Pa. Stat. § 802(b).   She appealed the denial and a hearing was held before a referee on November 1, 2013 and November 15, 2013. (Docket No. 55-5 and 55-6; 55-12 at 49).   Plaintiff asserted before the Unemployment Compensation referee in November 15, 2013 that the reason that she left her job at PHRC was that physically she could not sit for long periods of time, could not do the amount of typing required or the amount of walking needed from her desk to printer, that she was in a hostile work environment, in part,

---

[5] Williams also contends that she had additional conditions affecting her ability to work, including spasmodic dysphonia that prevented use of the voice-activated software provided by the PHRC, chronic pain, and stenosis of the lower lumbar spine, citing to the submitted FMLA form, but information regarding the spasmodic dysphonia does not appear on it.   (Docket No. No. 59 at ¶ 6 (citing Docket No. 57-10)).

because she believed Retort and Stalczynski were lying to her, holding closed-door meetings without her and making harmful statements about her, and that she had complained but nothing was done. (ASOF ¶ 10); (Docket Nos. 54 at ¶ 9 and 59 at ¶ 9; Docket Nos. 55-6 at 16; 59 ¶ 11).

After the referee denied benefits, she appealed to the Pennsylvania Unemployment Compensation Review Board ("Review Board"), the Review Board remanded the matter to a Referee to act as Hearing Officer for the Board, benefits were denied by the Review Board on August 13, 2014, and she thereafter petitioned for review of the Order of the Review Board to the Commonwealth Court of Pennsylvania. (ASOF ¶¶ 8, 12; Docket No. 55-12 at 50-51).   On June 24, 2015, the Commonwealth Court entered an Order and Opinion determining that Plaintiff was not entitled to Unemployment Compensation benefits because she voluntarily resigned from her employment with PHRC and did not have a necessitous and compelling reason for leaving work. (ASOF ¶¶ 8, 12).   Williams did not appeal.   (ASOF ¶ 13).   She now contends that she has become depressed because of her ongoing chronic pain due to fibromyalgia and stenosis, (ASOF ¶ 19); that she is currently disabled; and is receiving Social Security disability benefits due to fibromyalgia, chronic musculoskeletal pain and depression. (ASOF ¶ 20).

IV.    LEGAL STANDARD

A grant of summary judgment under Federal Rule of Civil Procedure 56(a) is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine issue of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment.

*Anderson*, 477 U.S. at 247-48.   As to materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.   However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

   The Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).   The initial burden is on the moving party to adduce evidence illustrating a lack of genuine issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 323 – 24). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal.   *Santini v. Fuentes,* 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587)). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F.App'x 139, 141 n. 4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F. 3d 195, 200 (3d Cir. 1995)).

   Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must rely on affidavits,

depositions, admissions, and/or interrogatory answers to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324). The court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility, rather the court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup,* 413 F.3d 359, 363 (3d Cir. 2005); *Simpson v. Kay Jewelers,* 142 F.3d 639, 643 n. 3 (3d Cir.1998) (quoting *Fuentes v. Perski*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)).

V.    DISCUSSION

Defendants contend that Williams never received any discipline or change in her compensation, terms or privileges of her work circumstances in 2012-2013 until she voluntarily left work in August 2013. (Docket Nos. 54 at ¶ 49, 55-9 at 14). Williams responds that Defendants discriminated against her on the basis of race, gender and disability by subjecting her to a hostile work environment that impeded her ability to efficiently work, by giving her a series of discriminatory disciplines that culminated in her constructive discharge, and by, at one point, suspending her without pay. For these propositions offered by Williams, she cites to pages 13-15 of her March 22, 2016 deposition, but those pages do not support her contentions. (Docket No. 59 at ¶ 49).[6] As to the claimed discipline, Williams' position appears to be that any direction by her supervisors with which she disagreed, including comments, a counseling note and the scheduling of a pre-disciplinary conference by letter, that may or may not have resulted in a corrective action or discipline, constituted actual actionable discipline regardless of whether they resulted in any change in the terms or conditions of her employment. She also contends that she suffered other

---

[6] Indeed, in "disputing" various of Defendants' statement of facts in paragraphs 48 and 49 (Docket No. 59 at ¶ 48, 49, Williams cites to the same pages several times which do not support her factual assertions, in violation of local rule 56.

"adverse employment actions," as discussed more fully *infra*.

Defendants put forth several bases for summary judgment on the claim against the PHRC under Title VII (Count II) for discrimination based on race and gender and the claim against Retort and Stalczynski under § 1983 (Count IV) for violation of rights created by Title VII, the ADA, and the PHRA.   In support of their motion, they argue that:

- § 1983 does not provide a cause of action for violation of rights created under state law, and therefore, they are entitled to summary judgment on the § 1983 claim predicated on violation of rights created by the PHRA (Docket No. 53 at 6);

- Title VII and the ADA do not create individually enforceable rights or rights enforceable against an individual under § 1983 (Docket No. 53 at 7, 8);

- Williams cannot sue the PHRC under Title VII for any discrete acts of discrimination occurring more than 300 days before a dual filed charge and occurring more than 180 days prior to a charge filed solely with the EEOC, and because Williams filed her charge in November of 2013, at a minimum she cannot sue for discrete acts occurring prior to 2013 (Docket No. 53 at 8, 9);

- Williams cannot show discrimination that rises to the level of an adverse employment action (Docket No. 53 at 9);

- Williams cannot establish a constructive discharge nor that she was forced to quit or retire due to any alleged failure of the PHRC to accommodate her[7] (Docket No. 53 at 9);

- the Pennsylvania Commonwealth Court's determination in *Williams v. Unemployment Comp. Review Bd.*, 2015 WL 5446802 (Pa. Commwlth. Ct. 2015), that Plaintiff did not leave her employment for a necessitous and compelling reason and that her claimed disability was adequately accommodated, bars her claim for constructive discharge here (Docket No. 53 at 9); and

- Williams cannot sue for hostile work environment based on acts occurring prior to the 300 day period before she filed her Charge because the acts are unrelated to acts within the 300 day period and further she cannot show conduct creating a hostile work environment. (Docket No. 53 at 10, 11).

---

[7] In attempting to bring her claim within the purview of Title VII, Plaintiff claims that the failure to accommodate her disability was based on her race.   (Docket No. 57 at 7-9).

20

Plaintiff argues in response that:

- both Title VII and the ADA create individually enforceable rights and the comprehensive remedial schemes do not preempt claims under § 1983 (Docket No. 57 at 2);

- § 1983 provides for individual liability (Docket No. 57 at 3);

- her claims are timely under the continuing violation theory and acts occurring outside the filing period were not discrete and isolated but rather part of a persistent discriminatory pattern (Docket No. 57 at 6);

- discrete acts falling outside the filing period properly are considered as background evidence in support of her timely claim (Docket No. 57 at 7); and

- she suffered adverse employment actions including regular and pervasive discriminatory harassment and removal of accommodations that forced her to quit her employment (Docket No. 57 at 7).

**A. Section 1983 Claim under Count IV against Retort and Stalczynski for Vindication of Rights Created by Title VII, the ADA and the PHRA.**

Williams seeks to sue Retort and Stalczynski under § 1983 for violation of rights created by Title VII, the ADA, and the PHRA. Section 1983 is not itself a source of rights, but rather a vehicle for vindication of rights created by the United States Constitution or federal statute. *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989). Williams cannot pursue a claim for violation of rights created by the PHRA. The PHRA is a state law and not a federal statute or any source of federal rights. Accordingly, summary judgment will be granted in favor of Defendants Retort and Stalczynski on the attempted § 1983 claim based on the PHRA. Thus, left for decision is whether Williams can pursue a claim under § 1983 for rights created by Title VII or the ADA.

The United States Supreme Court in *Middlesex County Sewerage Auth. v. National Sea Clammers Assoc.*, 453 U.S. 1, 20 (1981) (creating the *Sea Clammers* doctrine), held generally that

a statute providing its own comprehensive enforcement scheme may not be circumvented by suing directly under § 1983. *Sea Clammers* explained that the Supreme Court "has recognized two exceptions to the application of § 1983 to statutory violations: 1) where Congress has foreclosed private enforcement of the statute as indicated in the statute itself; and 2) where Congress through the Act did not create "rights, privileges, or immunities" within the meaning of § 1983, such as where the remedial devices provided in the subject Act are sufficiently comprehensive. 453 U.S. at 19-20. In *Sea Clammers*, the Court concluded the existence of express remedies provided in the Federal Water Pollution Control Act and Marine Protection, Research and Sanctuaries Act demonstrated that Congress intended to supplant any remedy otherwise available under § 1983. 453 U.S. at 29. In *Rancho Palos Verdes v. Abrams,* 544 U.S. 113, 115 (2005), the Court found that the comprehensive remedial statutory framework of the Telecommunications Act of 1996 precluded suit under § 1983. The Court further instructed in *Rancho Palos Verdes*, that where the federal statute creates explicit judicial remedies, the Court will presume Congressional intent to foreclose the use of § 1983 to enforce rights under the federal statute. 544 U.S. at 115. Subsequently, in *Fitzgerald* v. *Barnstable Sch. Cte.*, 555 U.S. 246, 254–55 (2009), the Supreme Court "reaffirmed the principle that, where a statute imposes procedural requirements or provides for administrative remedies, permitting a plaintiff to proceed directly to court via § 1983 would be inconsistent with Congress' carefully tailored scheme." *Hildebrand v. Allegheny Cnty.,* 757 F.3d 99, 109 (3d Cir. 2014), *cert. denied sub nom. Hildebrand v. Allegheny Cnty., Pa.,* 135 S. Ct. 1398, 191 L. Ed. 2d 359 (2015).

Where, as here, the plaintiff seeks to vindicate a statutory right under § 1983 and the statute at issue provides an enforcement scheme, the Court must discern whether Congress intended to allow a plaintiff to thwart that scheme by direct suit under § 1983. *Fitzgerald*, 555 U.S. at 254–55

(2009).   The Supreme Court reiterated in *Fitzgerald* that the crucial consideration is what Congress intended, and evidence of Congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.   555 U.S. at 252-253.

In *American Federal Savings v. Novotny*, 442 U.S. 366, 375-378 (1979), the Supreme Court determined that Title VII's enforcement scheme could not be bypassed *via* § 1985(3). Similarly, in *Alexander v. Chicago Park Dist.*, 773 F.3d 850 (7th Cir. 2014), in the context of a suit under §1983, the Court of Appeals for the Seventh Circuit expressed that "Title VII is one of the statutes that may not be bypassed." 773 F.3d at 856.

The recent opinion of the Court of Appeals for the Third Circuit in *Hildebrand*, addressing whether a claim will lie under § 1983 to enforce anti-age discrimination rights created by the ADEA, is highly instructive.   In *Hildebrand* the court determined that a plaintiff cannot bring a § 1983 claim to enforce rights under the ADEA.   The Court stated:

> In determining whether a statutory enactment precludes suit under § 1983, the crucial consideration is what Congress intended.   Congressional intent to preclude § 1983 claims may be inferred when the remedial devices provided in a particular Act are sufficiently comprehensive.   In *Sea Clammers,* the Supreme Court held that a plaintiff was precluded from bringing a § 1983 suit for damages under the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 *et seq.* (1976), and the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. § 1401 *et seq.* (1976). Emphasizing the unusually elaborate enforcement provision of the statutory framework, the Court concluded that allowing parallel § 1983 claims to proceed ... would have thwarted Congress' intent in formulating and detailing these provisions.

*Hildebrand*, 757 F.3d at 104-105 (internal citations and quotations omitted).

*Hildebrand* further noted the Supreme Court's observation in *Fitzgerald* "that in each of the cases where it found *a statute* to be the exclusive remedy for an asserted right, the statutes at issue required plaintiffs to comply with particular procedures and/or to

exhaust particular administrative remedies prior to filing suit," *Hildebrand*, 757 F.3d at 106 (citing *Fitzgerald*, 555 U.S. at 254–55 (internal quotations omitted). *Hildebrand* recognized the carefully tailored scheme of the ADEA, such that a suit for violation of ADEA rights brought directly under § 1983 would circumvent that scheme inconsistent with the intent of Congress. The *Hildebrand* Court thus concluded that a claim did not lie under § 1983 for enforcement of rights provided by the ADEA.

Plaintiff argues that *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 10179 (3d Cir. 1990), supports her cause of action under § 1983 for violation of statutory rights created by Title VII. *Bradley* recognized that Title VII did not preempt claims under § 1983 for vindication of constitutional rights, such as equal protection rights. Here, however, Williams expressly seeks to vindicate rights created by Title VII and the ADA by suit under § 1983, a very different proposition. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008).

Regarding the ADA, Williams cites *Frederick L. v. Dep't of Pub. Welfare*, 157 F.Supp.2d 509, 533-34 (E.D. Pa. 2001), for the proposition that ADA claims are not preempted. In so ruling, *Frederick* relies on language from the ADA providing:

> Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter.

42 U.S.C.A. § 12201. Preemption is not urged here. The language of the ADA cited in *Frederick* simply is not instructive as to whether the ADA creates rights separately enforceable under § 1983. Williams also relies on *Boone v. Pennsylvania Office of Vocational Rehab.*, 373 F. Supp. 2d 484 (M.D. Pa. 2005), which likewise is not instructive. *Boone* did not involve any attempt to vindicate ADA rights through suit under § 1983. Instead, *Boone* involved an ADA

claim and a separate claim under § 1983 for deprivation of the liberty interest in plaintiff's reputation. 373 F. Supp. 2d at 496.

As to Title VII, the Court of Appeals for the Fifth Circuit specifically held in *Irby v. Sullivan*, 737 F.2d 1418, 1428 (5th Cir. 1984), "that Title VII is the exclusive remedy for violations of rights created by Title VII itself." *Lakoski v. James*, 66 F.3d 751, 755 (5th Cir. 1995). Several other circuits likewise have agreed that "Title VII's comprehensive remedial scheme precludes § 1983 suits based upon violations of Title VII rights." 66 F.3d at 755 (citing *Day v. Wayne Cnty. Bd. of Auditors*, 749 F.2d 1199, 1204 (6th Cir. 1984); *Alexander v. Chicago Park Dist.*, 773 F.2d 850 (7th Cir. 1985); *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 982 (10th Cir. 1991).

*Mercer v. Southeastern Pa. Transit Auth.*, 26 F. Supp. 3d 432 (E.D. Pa. 2014), observed that the two circuit courts considering the issue, *Okwu v. McKim*, 683 F.3d 841, 844-845 (9th Cir. 2012), and *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1530-1531 (11th Cir. 1997), concluded that the ADA's comprehensive enforcement scheme precluded an action under § 1983. *Mercer*, 26 F.Supp.3d at 448 (ultimately declining to rule because plaintiff's § 1983 claim if allowed would fail). *Wesley v. Vaughn*, Civ. A. 99-1228, 2001 WL 210285 (E.D. Pa. Feb. 28, 2001), also concluded that ADA's enforcement scheme forecloses the use of § 1983.

As explained by the Court of Appeals for the Eleventh Circuit in *Holbrook*, regarding the ADA and the Rehabilitation Act:

> To permit a plaintiff to sue both under the substantive statutes that set forth detailed administrative avenues of redress as well as section 1983 would be duplicative at best; in effect, such a holding would provide the plaintiff with two bites at precisely the same apple. We conclude that a plaintiff may not maintain a section 1983 action in lieu of-or in addition to-a Rehabilitation Act or ADA cause of action if the only alleged deprivation is of the employee's rights created by the Rehabilitation Act and the ADA.

112 F.3d at 1531 (citation omitted); *Alsbrook v. Maumelle*, 184 F.3d 999, 1011 (8th Cir. 1999) (holding that the ADA's comprehensive remedial scheme bars a § 1983 claim).

The Third Circuit has observed that the ADA provides that individuals must follow the administrative procedures and enforcement scheme set forth in Title VII. *Itiowe v. NBC Universal Inc.*, 556 F.App'x 126, 128 (3d Cir. 2014). The Supreme Court in *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 296 (2002), recognized that the enforcement scheme intended by Congress in enacting the ADA, which is Title VII's enforcement scheme, is a detailed enforcement scheme.

Based on the foregoing, following *Sea Clammers* and considering the recognized comprehensive statutory and enforcement scheme of both the ADA and Title VII, the Court is constrained to conclude that Williams cannot seek to enforce rights created under the ADA and Title VII though § 1983. Accordingly, Defendants Retort and Stalczynski are entitled to summary judgment on the § 1983 claim against them under Count IV for enforcement of rights created by Title VII and the ADA.[8]

## B. Title VII Claim Under Count II Against the PHRC

Turning to the Title VII claim against the PHRC under Count II, the Court now considers the array of arguments and assertions presented by the parties, which at times are rather

---

[8] Defendants argue that even were rights created by the ADA and Title VII enforceable under § 1983, they would not be enforceable against individuals as any such rights conferred would not include the right as against individual employees. Plaintiff aptly argues that § 1983 authorizes suits against individuals. Although "an individual employee cannot be held liable under Title VII," *Dici v. Commonwealth of Pennsylvania*, 891 F.3d 542 552 (3d Cir. 1996), individuals may be held liable under the plain language of § 1983. As the Court determines that Plaintiff cannot seek to enforce rights created in the ADA or Title VII through § 1983, the argument is irrelevant. The claim advanced by Williams regarding ADA rights does not appear to be based on any anti-disability animus, but rather on an alleged failure to reasonably accommodate, due in part to a failure to engage in the interactive process. Her claim as against the individual defendants would necessarily be premised on some affirmative duty in the law for these individuals to reasonably accommodate another employee, yet the ADA's provisions do not create such a right and such a right is not supplied elsewhere by federal law. In this sense, the argument by Defendants as to individual rights would appear to have some force under § 1983 if enforcement of any "ADA right" was recognized.

convoluted. Williams asserts that she has suffered numerous adverse employment actions by the PHRC, including discriminatory disciplines, a suspension without pay, hostile work environment, failure to reasonably accommodate her disability (apparently based on racial discrimination), and ultimately a constructive discharge. It is unclear whether Williams contends that the actions individually are actionable discrimination or whether she only contends that they are just part and parcel of the claimed hostile work environment leading to constructive discharge. The Court thus addresses them under both scenarios.

Title VII provides that:

> it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1). Here, Williams claims discrimination based on race and/or sex.

### 1. Time Bar and Continuing Violation Doctrine

The PHRC argues that to the extent Williams seeks to hold it liable for conduct occurring prior to 2013, her claims are time-barred because she filed her Charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in November 2013. (Docket No. 54 at ¶ 15; 59 at ¶ 15). Williams portends somehow not to know if she dual filed the charge for the stated reason that the PHRC, the state agency charged with investigating claims of discrimination in employment in Pennsylvania, was the respondent to the charge. (Docket No. 57-2 at 66).[9] Notwithstanding that there is no affirmative evidence in the record that the Charge ever was dual filed, for purposes of the present motion for summary judgment the Court assumes it to be dual

---

[9] Plaintiff testified that cases typically are automatically dual filed but because the PHRC was the respondent she could not "see any reason why they would have dual filed it with the PHRC." (Docket No. 57-2 at 66).

filed because Defendants proceed assuming same and have not provided any further evidence or argument on the matter.

To bring suit under Title VII, where the plaintiff is in a deferral state, such as Pennsylvania, she must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002). A discrete act in itself constitutes a separate actionable unlawful employment practice. *Id.* at 114. Discrete acts include, for example, "termination, failure to promote, denial of transfer, or refusal to hire," *Id.*; *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013), as well as a suspension without pay, *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015), and a failure to provide a required reasonable accommodation. *Mercer v. Septa*, 608 F.App'x 60, 63 (3d Cir. 2015).

Williams asserts that the continuing violation doctrine applies to her case, such that all of the conduct she challenges is actionable despite the time limit for filing a charge, relying on *Morgan,* 536 U.S. 101, 114. According to her, the conduct is all linked in a continuing violation because "[a]ll of the discrete acts of discrimination and hostility were all specifically related to and because of Plaintiff." (Docket No. 57 at 12). This argument is insufficient as it merely conflates the continuing violation doctrine with a required element of her claim—that *she* was subjected to a hostile work environment.

> Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts "can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." *O'Connor v. City of Newark,* 440 F.3d 125, 127 (3d Cir.2006) (citing *Morgan,* 536 U.S. at 105, 122 S.Ct. 2061 (explaining court may consider "entire scope of a hostile work

28

environment claim ... so long as any act contributing to that hostile environment takes place within the statutory time period")). A hostile work environment claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice' " and "cannot be said to occur on any particular day." *Morgan,* 536 U.S. at 115–17, 122 S.Ct. 2061. To allege a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period. *See Morgan,* 536 U.S. at 122, 122 S.Ct. 2061; *see also West v. Phila. Elec. Co.,* 45 F.3d 744, 754–55 (3d Cir.1995) (explaining plaintiff must show that at least one act occurred within the filing period and that the harassment is "more than the occurrence of isolated or sporadic acts of intentional discrimination").

*Mandel,* 706 F.3d at 165-66.

The Court considers the subject matter of the conduct and its frequency to distinguish continuing violations from isolated acts. *Mandel*, 706 F.3d at 166-167 (indicating that after Morgan the prior degree of permanence factor is no longer a required factor). In *Mandel*, the Court of Appeals for the Third Circuit explained:

Having clarified our continuing violation doctrine following *Morgan,* we find that Mandel has alleged at least one act that falls within the statute of limitations (i.e. Bachert calling her a "bitch" during a meeting), and many of the acts that occurred prior to the applicable limitations period involved similar conduct by the same individuals, suggesting a persistent, ongoing pattern. We will, therefore, remand the case to the District Court for further proceedings, including a determination of the scope of the incidents properly considered part of the continuing violation for the hostile work environment claim.

*Mandel,* 706 F.3d at 167.

A plaintiff cannot use the continuing violations doctrine simply to connect untimely claims to a related timely claim. *Boyd v. Citizens Bank of Pennsylvania, Inc.*, No. 2:12-CV-00332, 2014 WL 2154902, at *16 (W.D. Pa. May 22, 2014) ("The doctrine has no application however, to discrete and complete discriminatory acts and a plaintiff cannot rely on the doctrine to connect untimely claims to a related timely claim.") (citing *Morgan,* 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in

29

timely filed charges.")).   The Court will consider whether Williams can show a hostile work

environment based on race and/or sex within the statutory time period and will keep in mind that in

determining the timeliness of Williams' hostile work environment claim, that it may consider

whether the individual alleged to have created or caused the hostile work environment no longer

worked with the plaintiff in the statutory period prior to the Charge, *Mercer v. Septa*, 608 F. App'x

at 64, and whether actions outside the 300 day period are related in a pattern of discrimination

which continues into the statutory period. *O'Connor,* 440 F.3d at 127.   A failure to reasonably

accommodate is a discrete act and not part of a continuing violation. "A reasonable

accommodation request is a one-time occurrence rather than a continuing practice, and therefore,

does not fit under the continuing violations theory." *Mercer v. Septa*, 608 F.App'x 60, 63 (3d Cir.

2015).

> In *Boyd*, this Court observed:
>
> Here, Plaintiff's claims in her 2007 PHRC filing, as well as her 2010 EEOC filing,
> contain allegations relating to failure to promote and/or transfer, unwarranted
> performance expectations, and downgraded performance ratings. These are the
> types of "discrete acts" to which the continuing violation doctrine simply does not
> apply, and Plaintiff cannot resurrect these untimely claims.   In sum, there is no
> genuine issue of material fact in dispute regarding the relevant dates with respect to
> Plaintiff's PHRC and EEOC filings, and her claims are based upon discrete acts for
> which the continuing violation doctrine does not apply. Accordingly, her claims are
> time—barred as a matter of law and summary judgment will be granted in favor of
> Defendant with respect to these claims. Evidence relating to these time-barred
> claims will nonetheless be considered by the Court as background evidence in
> support of Plaintiff's timely termination claim.

*Boyd*, 2014 WL 2154902, at *16.

## 2.  Adverse Employment Action

An adverse employment action is one that alters the terms, conditions or privileges of

employment and includes actions that are more than trivial or minor changes in an employees'

working conditions, such as suspension without pay and transfer to an undesirable position. *Wicther v. Sodexho, Inc.*, 247 F. App'x 328, 331 (3d Cir. 2007). The law likewise makes actionable "environmental claims" or "hostile work environment claims" that because of their nature are said to alter the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

To be actionable, an alleged disciplinary measure must constitute an adverse employment action. *Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015) (element of claim of discrimination that "the particular disciplinary measure was an adverse employment action."). Williams contends that the counseling memo and the scheduling of a pre-disciplinary conference constituted discipline that was an adverse employment action. First, viewing the evidence in the light most favorable to Williams, as the Court must on summary judgment, a *pre-disciplinary* conference cannot fairly be construed as discipline. Second, and more importantly, the real consideration here is whether the challenged "disciplinary measure" constituted an adverse action altering the terms and conditions of her employment.

Williams argues that she suffered an adverse employment action when she was suspended without pay for five days at one point for allegedly refusing to sign a discipline that was based on a false disciplinary report filed by Surloff, former PHRC legal counsel. (Docket No. 57 at 9-10). In reviewing the evidence, it appears that this occurred in March of 2009; therefore, to the extent she seeks to hold the PHRC liable for this adverse action, as it occurred several years before she filed a charge of discrimination, she can only do so if it is part of an actionable hostile work environment or constructive discharge. Other than the general assertion that it happened to her, Plaintiff does not connect this conduct to the challenged conduct in the statutory period and the Court does not find that it is connected or part of a pattern.

She argues that the alleged disciplines she suffered rose to the level of an adverse employment action because they affected the terms, conditions and privileges of her employment. (Docket No. 57 at 10). Specifically, she claims the letter by Stalczynski to her regarding the call-off procedure, her being yelled at by Stalczynski regarding the email discourse they had, "and so forth" all contributed to her constructive discharge. (Docket No. 57 at 10).

Williams' complaints that she knew she was being "investigated" despite the lack of confirmation by her employer do not, even if true, show an adverse employment action. *Rosati v. Colello,* 94 F. Supp. 3d 704, 714 (E.D. Pa. 2015); *cf. Scott v. Sunoco Logistics Partners, LP*, 918 F. Supp. 2d 344 (E.D. Pa. 2013) (failure to provide written notes and conclusions from an investigation is not an adverse employment action). To be sure, the negative consequences from an employer's investigation may rise to the level of an adverse employment action when and if an employee is eventually disciplined as a result, but the "investigation alone is not an adverse employment action." *Rosati,* 94 F. Supp. 3d at 714. Even a paid suspension pending an investigation does not constitute an adverse employment action, although a suspension without pay does. *Jones*, 796 F.3d at 326. The asserted failure of her superiors to answer her and admit to her, their subordinate, that there was an investigation likewise is not an adverse employment action.

More importantly, the *de minimis* administrative decisions with which Williams disagrees do not constitute adverse employment actions. *Clayton v. Pa. Dept. of Pub. Welfare,* No. 05–0768, 2007 WL 575677, at *9–10 (M.D.Pa. Feb.20, 2007) (moving of plaintiff's mailbox, removal of his desk from his office without notice, and not giving him the office he wanted, were not adverse employment actions). A counseling memo is not an adverse employment action. *Torres v. Deblasis*, 959 F. Supp. 2d 772, 790-781 (E.D. Pa. 2013). Even written reprimands not resulting

in a material change in the terms or conditions of employment do not constitute adverse employment actions. *Mieczkowski v. York City School Dist.*, 414 F. App'x 441, 446-447 (plaintiff must show more than the reprimands were unfairly issued). "[A] smattering of minor grievances, even if inconvenient, do not amount to adverse employment action under Title VII." *McCartney v. Pennsylvania State Police*, No. 9 CV 1817, 2011 WL 3418381, at *20 (M.D. Pa. Mar. 9, 2011), *report and recommendation adopted*, 2011 WL 3293283 (M.D. Pa. July 29, 2011).

It is by no means certain that even if a transfer to intake had occurred given the described closed-door discussions between Retort and Stalczynski that such would constitute an adverse employment action by the PHRC. *Boyd,* 2014 WL 2154902, at *24 (transfer to same title and position level with same compensation and benefits based on business needs of department does not subject plaintiff to discriminatory treatment). Here, however, no transfer took place; there is no evidence that any decision to transfer Williams ever was made, nor was Williams ever notified that such a transfer was to take place; rather, Williams simply overheard a *discussion* by her supervisors of *possibly* transferring her to intake. Such does not constitute an adverse action or actionable discipline, much less a plot to harm her as Williams suggests.

Williams is able to show that she experienced an unpaid suspension in 2009. As such, it's untimely for the present action. Moreover, it was a discrete and isolated event involving PHRC counsel and not her supervisors, and it involved actions unconnected in any way to the actions by Stalczynski and Retort in 2013.

Plaintiff argues that Defendants refused to continue providing her with accommodations and asserts that "the PHRC had no justification whatsoever for refusing the accommodations as most of the equipment purchased to accommodate Plaintiff was transferred to the new location, but used for other things." (ECF No. 57 at 8). She indicated that she complained about the need for

an adjustable height desk to Simmons, Floyd and Stalczynski "to no avail."   (Docket No. 57 at 8).

She points to evidence that Simmons, her then Regional Director, stated to another employee,

David Jones, that they would not try to accommodate her.   (Docket no. 57 at 8).   But, the actual

testimony referenced by Williams shows that Jones had discussed with Simmons further

accommodation of Williams, and Simmons advised that what they had done to accommodate was

all that they were going to do, and that Jones was to stay out of it.   (Docket No. 57-19 at 11-14).

Williams relies on *Durham Life Ins. Co.*, 166 F.3d 139, 153 (3d Cir. 1999), for the

proposition that the "[r]efusal to engage in the interactive process of accommodation is an adverse

employment action."   (Docket No. 57 at 9).   *Durham* is not a disability case and nowhere

discusses the duty of reasonable accommodation that an employer has under the ADA or other

law.   In *Durham*, a Title VII case for discrimination based on gender, the plaintiff insurance agent

had negotiated a private office and secretary, which she needed to assist her in the way she dealt

with her insurance accounts because of the nature of her business, not any disability.   The Court

of Appeals determined in *Durham* that she suffered an adverse employment action because her

earning potential was substantially decreased and she suffered a significant disruption in her

working conditions.   166 F.3d at 153.   Nevertheless, it is true that the failure to reasonably

accommodate can be an adverse employment action.   *Mercer*, 608 F.App'x at 63.   Her

disability claims, however, have been dismissed.   (Docket No. 15).

To connect this issue to her Title VII claims, she argues that in addition to her, Defendants

refused to accommodate another African-American employee, but instead accommodated a

Caucasian employee.   (Docket No. 57 at 9).   This alleged failure or refusal to accommodate

occurred <u>prior to 2011</u>.   Additionally, the evidence does not establish that any decision not to

provide her an accommodation was based on race and/or sex.   The only evidence provided by

Williams regarding these two employees does not show that they were similarly situated or circumstances raising an inference of discrimination based on race. Even so, this asserted discrimination is well divorced from the alleged harassing conduct in the statutory period, discussed *infra*, namely Stalczynski's demeanor and interaction with Williams. Accordingly, Williams may survive summary judgment on her Title VII claim only by showing a hostile work environment and/or constructive discharge.

### 3. Hostile Work Environment and Constructive Discharge

Williams provides a laundry list of actions towards her that she claims created a hostile work environment. Much of the conduct to which she points as creating a hostile work environment is perceived by her to be rude or insulting or did not involve any inherently racist or sexist comments made to her. Little of it occurred within or could be connected to conduct occurring within the 300 day window of her Charge. Indeed, by her own testimony, some of the challenged actions clearly were not based on racial or gender discriminatory animus, but rather on an anti-union animus, which is not actionable under Title VII. 42 U.S.C. § 2000e–2(a)(1) (protecting against discrimination based on race, color, religion, sex and national origin).

### i. Effect of Commonwealth Court's Decision

Defendants argue that the Pennsylvania Commonwealth Court's holding in *Williams v. Unemployment Comp. Bd. of Review*, No. 1489 C.C. 2014, 2015 WL 5446802 (Pa. Comwlth. Ct. 2015), that Williams did not leave her employment for a necessitous and compelling reason bars her claim that she was constructively discharged on account of hostile work environment, asserting that the decision by the Commonwealth Court is entitled to full faith and credit under 28 U.S.C. § 1738, and by stating in a footnote that under Pennsylvania law a hostile work environment constitutes a necessitous and compelling reason for leaving employment, entitling

the employee to unemployment benefits. (*See* Docket No. 53 at 9 & n.1) (citing *Taylor v. Unemployment Comp. Bd. of Review*, 378 A.2d 829 (Pa. 1977) and *W. & S. Life Ins. Co. v. Unemployment Comp. Bd. of Review*, 913 A.2d 331, 337 (Pa. Comwlth. Ct. 2006)). In Defendants' initial brief on summary judgment, they do not address the standard to apply full faith and credit. Williams points out that as instructed in *Allen v. McCurry*, 449 U.S. 90 (1980), through 28 U.S.C. § 1738, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." 449 U.S. at 96.

In *Rue v. K-Mart Corp.,* 713 A.2d 82, 86-87 (Pa. 1998), the Pennsylvania Supreme Court determined that a finding of fact by an unemployment compensation referee would not have preclusive effect in an action for defamation, in part, because the "fast and informal nature of the proceedings" did not afford the defendant therein a "full and fair opportunity" to litigate the issue. The Court instructed that for an issue to have preclusive effect under Pennsylvania law, the following four prongs must be met:

> (1) An issue decided in a prior action is identical to one presented in a later action;
> (2) The prior action resulted in a final judgment on the merits;
> (3) The party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and
> (4) The party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.

*Rue v. K-Mart Corp.*, 713 A.2d 82, 84 (Pa. 1998). The Pennsylvania Supreme Court acknowledged as well that where the matter involves preclusive effect of a decision under one statute to be applied in a decision under another statute the policy differences underpinning the two statutory provisions are an important consideration for the court. 713 A.2d at 85.

The Court of Appeals for the Third Circuit in *Kelley v. TYK Refractories Co.,* 860 F.2d

36

1188 (3d Cir. 1988), though decided prior to *Rue*, considered the same standards for preclusive effect in Pennsylvania and held that a finding under Pennsylvania's Unemployment Compensation law that the plaintiff therein did not leave his employment for a compelling and necessitous reason was not entitled to preclusive effect in a race discrimination claim brought under § 1983. Declining preclusion, *Kelley* specifically held that "[t]he eradication of unlawful discrimination that Congress intended to accomplish through § 1981 is not encompassed by Pennsylvania's Unemployment Compensation law." 860 F.2d at 1195.

Subsequently, by Pennsylvania statute as amended in 2003, Pennsylvania expressly provided the effect of a finding of fact or law in an unemployment compensation case as follows:

> Any decision made by the department or any referee or the board shall not be subject to collateral attack as to any application claim or claims covered thereby or otherwise be disturbed, unless appealed from.
> Subject to appeal proceedings and judicial review, any right, fact or matter in issue which was directly passed upon or necessarily involved in any decision of a referee or the board or the Court and which has become final shall be conclusive for all purposes of this act and shall not be subject to collateral attack as among all affected parties who had notice of such decision: Provided, however, that whenever an appeal involves a question as to whether services were performed by a claimant in employment or for an employer or whether remuneration paid constituted wages, a decision thereon shall not be conclusive as to an employing entity's liability for contributions unless the employing entity was given special notice of such issue and of the pendency of the appeal and was afforded a reasonable opportunity by the referee or the board to adduce evidence bearing on such question. *No finding of fact or law, judgment, conclusion or final order made with respect to a claim for unemployment compensation under this act may be deemed to be conclusive or binding in any separate or subsequent action or proceeding in another forum.*

43 Pa. Stat. Ann. § 829 (emphasis added).

As full faith and credit requires that this Court give the same preclusive effect to the decision by the Commonwealth Court as Pennsylvania courts would, and the express provisions of the Unemployment Compensation Act provides that "[n]o finding of fact or law, judgment, conclusion or final order made with respect to a claim for unemployment compensation under this

act may be deemed to be conclusive or binding in any separate or subsequent action or proceeding

in another forum," 43 Pa. Stat. § 829, the decision by the unemployment compensation referee

ultimately affirmed by the Commonwealth Court that Williams did not leave her employment for a

necessitous and compelling reason cannot be given any preclusive effect here.[10] *See also Mathis v.*

*Christian Heating and Air Condition, Inc.*, 91 F.Supp.3d 651, 656 (E.D. Pa. 2015) (treating

plaintiff's motion for clarification as one for reconsideration and departing from local rule

regarding timeliness of plaintiff's motion because 43 Pa. Stat. § 829 "clearly provides that findings

of fact and conclusions of law made with respect to unemployment compensation claims under

Pennsylvania law do not have preclusive effect in subsequent proceedings, such as the one before

[the court]."); *see also Gilson v. Pennsylvania State Police*, 175 F. Supp. 3d 528, 566 n. 31 (W.D.

Pa. March 30, 2016), *appeal docketed*, No. 16-2144 (3d Cir. 2016); *Training Assoc. Corp. v.*

*Unemployment Comp. Bd. of Review*, 101 A.3d 1225, 1234 (Pa. Commw. Ct. 2014).

Defendants attempt to revive their argument on preclusion in their Reply Brief by citing an

unpublished and nonbinding case, namely *Spyridakis v. Riesling Group, Inc.*, 398 F. App'x 793

(3d Cir. 2010). (Docket No. 61 at 3). *Spyridakis* does not address the effect of 43 Pa. Stat. § 829

or even reference that statute at all, addressing instead what it termed an issue of law. *Spyridakis*

also acknowledged that the Third Circuit had previously concluded "that a ruling adverse to the

employee in the unemployment compensation proceedings was not entitled to preclusive effect in

a subsequent case asserting race discrimination claims." 398 F. App'x at 798 (citing *Kelley*).

Based on the legislative enactment by the Commonwealth of Pennsylvania in 43 Pa. Stat. § 829,

---

10 Defendants attempt to argue that even if the decision of the Commonwealth Court is not given preclusive effect, it
has probative value. (Docket No. 61 at 4). The Court, however, does not weigh the evidence on summary judgment
and the cases cited to by Defendant do not instruct otherwise. *See, e.g. Long v. Valley Forge Military Academy
Foundation*, Civ. A. 03-CV-05793, 2008 WL 5157508, at *14 (E.D. Pa. July 21, 2008)(declining to strike allegations
regarding decision by Pennsylvania Unemployment Compensation Review Board).

the instruction by the Court of Appeals for the Third Circuit in *Kelley* and the Pennsylvania

Supreme Court in *Allen,* this Court finds that the prior decision by the Commonwealth Court in

regards to Williams' unemployment compensation claim has no preclusive effect in this matter.

Nevertheless, as discussed *infra*, Williams has not adduced sufficient evidence from which a

reasonable jury could find that she suffered a hostile work environment and constructive

discharge, and summary judgment will be entered on that basis.

### ii.    Hostile Work Environment

*McClendon v. Dougherty*, No. 2:10-CV-1339, 2011 WL 677481 (W.D. Pa. Feb. 15, 2011),

recognized that:

> The Supreme Court first recognized a hostile work environment as a basis for a
> discrimination claim under Title VII in *Meritor Savings Bank, FSB v. Vinson,* 477
> U.S. 57, 65–68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), a case claiming sexual
> harassment. A hostile work environment is now established as a basis for
> harassment claims charging discrimination against a protected class. *See National
> R.R. Passenger Corp,* at 115; *Faragher v. Boca Raton,* 524 U.S. 775, 786–87, 118
> S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Cardenas v. Massey,* 269 F.3d 251, 260 (3d
> Cir.2001); *Abramson v. William Patterson College of New Jersey,* 260 F.3d 265,
> 276–277 (3d Cir.2001); *Mufti v. Aarsand & Co., Inc.,* 667 F.Supp.2d 535, 544–545
> (W.D.Pa.2009).

*McClendon*, 2011 WL 677481, at *7.   The same standards apply whether the hostile work

environment claim is based on race or sex.   *AMTRAK v. Morgan*, 536 U.S. 101, 116 n. 10 (2002).

Hostile work environment claims may exist in two categories:   1) harassment culminating

in a tangible employment action, such as termination or demotion; and 2) harassment that does not

result in a tangible employment action. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 144

(2004).   Either theory can support a claim for unlawful discrimination in employment.

For purposes of summary judgment, Defendants do not appear generally to refute Williams' stance as to the motive behind the conduct allegedly creating a hostile work environment and constructive discharge. Instead, they assert that such conduct did not create a hostile work environment or result in a constructive discharge. In large measure, the actions that Williams challenges as creating a hostile work environment and causing her constructive discharge, such as her superiors correcting her, disagreeing with her or instructing her contrary to her own understanding of procedures, are simply managerial functions or *de minimis* administrative decisions. Hence, they do not evidence a hostile work environment and would not cause a constructive discharge. Similarly, rudeness or perceived rudeness by her superiors is insufficient and beyond the scope of anti-discrimination laws.

A claim of discrimination based on hostile work environment requires conduct that is extreme so as to amount to a change in the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1996). The ordinary tribulations of the workplace do not constitute actionable discrimination. These "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. 775, 788). A utopian workplace or a workplace free from strife is not guaranteed by Title VII. *Fichter v. AMG Res. Corp.*, 528 F. App'x 225, 231 (3d Cir. 2013).

> Rather, Title VII protects an employee from [sex and race] discrimination in the workplace, which includes freedom from a racially-hostile work environment [or a hostile work environment based on sex]. If the workplace is unpleasant, or even revolting, for any reason other than hostility generated . . . on account of an employee's membership in a protected class under Title VII, then the hostile environment fails to implicate a federal claim. In short, personality conflicts between employees are not the business of the federal courts.

*Hoist v. N.J.*, No. CIV.A. 12-5370 FLW L, 2015 WL 4773275, at *22 (D.N.J. Aug. 13, 2015),

*aff'd,* 642 F. App'x 169 (3d Cir. 2016) (internal quotations omitted).

> *Mandel* instructs:
>
> To determine whether an environment is hostile, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *see also Caver v. City of Trenton,* 420 F.3d 243, 262–63 (3d Cir.2005) ("[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario."). . . . [A] Court must consider the totality of the circumstances, rather than parse out the individual incidents, to determine whether the acts that collectively form the continuing violation are severe or pervasive.

*Mandel,* 706 F.3d at 168.

Thus, in order to prove hostile work environment, Williams must show "that her workplace was 'permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Peace-Wickham v. Walls*, 409 F. App'x 512, 519 (3d Cir. 2010)(quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (quotations omitted)). "[O]ffhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." *Caver v. City of Trenton,* 420 F.3d 243, 262 (3d Cir. 2005) (internal quotations and citations omitted). Offensive conduct or conduct that renders the employee's worklife unpleasant or uncomfortable is insufficient. *McClendon*, 2011 WL 677481, at *8. "The mere utterance of an ... epithet which engenders offensive feelings in an employee, is not sufficiently significant as to effect the conditions of employment and thereby violate Title VII." *Id.* (citations omitted).

Harassment can be said to be pervasive when "incidents of harassment occur either in concert or with regularity." *Andrews v. City of Phila.*, 895 F.2d 1469 (3d Cir. 1990) (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987). "Similarly, the 'severity' of the alleged discriminatory treatment is assessed by considering 'the totality of the circumstances,' focusing on the overall scenario." *Walls*, 409 F. App'x at 519 (citing *Caver*, 420 F.3d at 262-263).

In *Boyd*, this Court observed that "many of the 'hostile' actions alleged, such as [plaintiff's] disagreement with her performance evaluations, being chastised for leaving her desk early and not turning off her computer, and leaving a document in the photocopier, are simply managerial functions and not evidence of a hostile environment." *Boyd*, 2014 WL 2154902, at *25, *appeal dismissed* (Oct. 9, 2014) (citing *Fichter v. AMG Resources Corp.,* 528 F. App'x 225, 231 (3d Cir.2013)). As to much of the conduct she perceives as discriminatory, Williams merely is contesting decisions by her supervisors with which she disagrees.

To survive summary judgment on a claim of hostile work environment, however, Williams must present sufficient evidence from which a reasonable jury could find that the harassment was "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). An objectively hostile or abusive work environment based on gender or race violates Title VII because it alters the terms and conditions of employment of a reasonable employee. *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 278-279 (3d Cir. 2001). The standards for showing a hostile work environment are meant to "filter out complaints attacking the ordinary tribulations of the workplace, such as sporadic use of abusive language, [protected class]-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788.

Conversations in which a prohibited class status is discussed, though offensive are insufficient. *Witcher*, 247 F. App'x at 331 (indicating that two conversations mentioning the plaintiff's age "in a way that might be interpreted as negative or questioning of his ability to perform his duties" are legally insufficient). The mere utterance of a racial epithet or epithet based on sex though it engenders offense is not sufficient. *Rogers v. EEOC*, 454 F.2 234 (5th Cir. 1971); *see also Grassmyer v. Shred-It USA, Inc.*, 392 F. App'x 18, 25, 30 (3d Cir. 2010) (no hostile work environment claim where manager regularly referred to the size of his genitalia, detailed sexual relationships and used derogatory terms such as "b—— hes"); *Kimber–Anderson v. City of Newark,* 502 F. App'x 210, 214 (3d Cir. 2012) (sporadic use of abusive language not enough); *Barnett v. New Jersey Transit Corp.,* 573 F. App'x 239, 245 (3d Cir. 2014) (nonprecedential) (black female plaintiff's overhearing white supervisors refer to a black female executive as a "black bitch" not enough to create a hostile work environment); *Bumbarger v. New Enter. Stone & Lime Co.*, No. CV 3:14-137, 2016 WL 1069099, at *15-20 (W.D. Pa. Mar. 17, 2016) (same where supervisor touched plaintiff, "mooned" her, and called the plaintiff a "b——h" and a "c—t" repeatedly); *McClendon*, 2011 WL 677481 (allegations of racial harassment insufficient for hostile work environment claim where plaintiff alleged his application for dean had not been advanced, plaintiff had been referred to as "a token," plaintiff was accused of making a baseless claim of racism, defendant appointed individual referencing "a token" to decanal search committee, defendant appointed white dean without interviewing any minority candidate, and once plaintiff filed Charge of discrimination, internal investigation ceased); *Dreshman v. Henry Clay Villa,* 733 F. Supp. 2d 597 (W.D.Pa.2010) (summary judgment granted, in part, because comments concerning plaintiff's prior occupation as male stripper, his physical appearance, that he needed to "get laid" and that men should not be nurses along with instances of unwanted touching

43

of a sexual nature were insufficient to state claim for hostile work environment); *Rose v. Woolworth Corp.,* 137 F. Supp. 2d 604, 608, 611 (E.D.Pa.2001) (granting summary judgment to defendant on hostile work environment claim where plaintiff alleged that supervisor subjected plaintiff to "constant and unremitting negative comments and evaluations" based at least in part on plaintiff's race, referred to black community as a "baby factory," stated that blacks are incapable of thinking analytically, and warned the plaintiff, who was black, not to talk to white women); *Francis v. Chemical Banking Corp.,* 62 F. Supp. 2d 948, 959–60 (E.D.N.Y.1999) (evidence insufficient where plaintiff alleged that a supervisor had called a group of African–American employees "f ____ g moolies," another supervisor referred to a co-worker as "n ____," another supervisor questioned the use of giving money to the United Negro College Fund, and plaintiff found written on his workstation, "All 'n ____ s' should go back to Africa with a Jew under each arm"); *Woodard v. PHB Die Casting,* 255 F. App'x. 608, 608–609 (3d Cir. 2007) (burning cross and KKK sign drawn on rest room was not removed for three months after reported by plaintiff nevertheless was insufficient to state claim for hostile work environment). Here, the term "bitch" though not uttered to Williams was allegedly uttered about her and her prior supervisor had referred to her several years prior to her leaving employment as "an aggressive female" for her union activity. The "legend in her own mind" comment, though unkind is not any epithet based on race or sex. These incidents appear isolated, are not severe, and were not persistent.

The Court is mindful that it is to consider the totality of the circumstances and atmosphere and not to simply parse out individual events in isolation. *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149, 155 (3d Cir. 1999). Certain events advanced as discriminatory and contributory to the "hostile work environment" and eventual constructive discharge, as well the evidence related thereto, must be considered in context in order to consider the nature of the conduct, keeping in

mind that the evidence is viewed in the light most favorable to Williams on summary judgment. Yet, the Court also is not "to cobble together unsubstantiated theories from otherwise innocuous facts." *Fichter,* 528 F. App'x at 232.

Williams claims as discriminatory and contributing to a hostile work environment and eventual constructive discharge, an incident wherein she was yelled at by Stalczynski, certain email discourse, an overheard conversation taking place behind closed doors between supervisors, and the general demeanor and conduct of Stalczynski towards her. To be sure, the evidence paints a picture of a contentious workplace between Williams and her supervisors; however, contention in the workplace is insufficient and the contention evidenced here cannot be fairly construed as emanating solely from her employer or supervisors. Indeed, several events pointed to by Williams as evidencing rude behavior towards her and causing her offense do indeed appear from her own testimony to have been instigated by her less than courteous approach to those in supervisory roles above her—whether they be her direct supervisor or in higher positions. Regardless, an employee is neither entitled to a workplace free from discourteous behavior nor a utopian one. Williams would have the Court enforce an odd civility code under the guise of anti-discrimination laws that would require her supervisors to always treat her with kindness and courtesy though she not be required to extend the same, which the Court will not and cannot do. *Faragher*, 524 U.S. at 788, (stringent standard to filter out ordinary tribulations as Title VII is not a civility code); *Fichter*, 528 F. App'x at 231 (utopian workplace not goal of Title VII); *Potter*, 435 F.3d 451 (citing *Faragher*, 524 U.S. at 788) (Title VII does not "mandate a happy workplace. Occasional insults, teasing, or episodic instances of ridicule are not enough."); *Solomon v. Caritas*, No. CV 15-4050, 2016 WL 4493193, at *7 (E.D. Pa. Aug. 26, 2016).

Williams urges as evidence that other employees complained of working in a hostile work environment. First, that other employees complained of a hostile work environment does not further her claim or constitute proof. Second, consideration of the testimony cited to by Williams reveals that these complaints were that they were being subjected to a hostile work environment based on bringing "issues of union matters to the fore," (Docket No. 57-20 at 67), which is not part of Title VII's concerns.

Williams also claims that at one point the prior Pittsburgh Regional Director, George Simmons, instructed Williams' then direct supervisor, Kathleen Wilkes "to put pressure on Plaintiff and prevent her from doing her work." (Docket, No. 57 at 1). Review of Wilkes' testimony clarifies that not only did this issue also relate to union activities, but that there was no direction to get Williams fired or make her quit. (Docket No. 57-20 at 68-70). Rather, there was pressure on Wilkes to put pressure on Williams because Simmons did not want Williams spending her time doing union work as opposed to PHRC work. (*Id.*). Finally, as Wilkes left the PHRC in 2010 and Simmons retired in 2011, such claim is unconnected to the conduct of Stalczynski and Retort and occurred years before the alleged constructive discharge. (*Id.*).

In *Sherrod v. Phila. Gas Works*, 57 F. App'x 68, 75-77 (3d Cir. 2003), the Court found insufficient to establish a hostile work environment incidents involving a manager referring to the alleged "culture" of African-American employees, indicating that he was "going to sit at their desks with a whip," and locating African-American employees' desks directly in front of their white supervisor's office window, excluding plaintiff from a meeting despite plaintiff's presentation being on the Agenda, "snubbing" plaintiff with a turned back, and the management team screaming at and treating plaintiff badly. Similarly, in *King v. City of Phila.,* 66 F.App'x

300, 305 (3d Cir. 2003), the Court held that plaintiff failed to establish a pervasive atmosphere of harassment with evidence that the plaintiff was subject to a racial epithet, was physically pushed and threatened that his work record would be sabotaged, finding the incidents isolated and sporadic. Conversely, in *Cardenas v. Massey*, 269 F.3d 251, 258-59 (3d Cir. 2001), the Court found the evidence sufficient where the plaintiff was subjected to: ethnic slurs and comments beginning from plaintiff's initial interview and continuing for 3 years; repeated questioning whether he would pull a switchblade in response to professional disagreements; anonymous messages with epithets on plaintiff's marker board; his manager rounding up performance ratings of non-Hispanic subordinates and rounding down plaintiff's scores when calculating overall performance scores, spreading the rumor that plaintiff was an affirmative action hire, and issuing knowingly contradictory instructions and assignments.

Here, much of what Williams contends is "discrimination" is garden variety disagreement and tribulations in the workplace not addressed by Title VII as discrimination in the terms and conditions of employment based on a prohibited factor. As noted, the vicissitudes of everyday life in the workplace do not rise to the level of a hostile work environment; something more is required. Rude behavior and disagreement with Williams, even if she could be characterized as generally agreeable in the workplace, would not meet the requirements to show a hostile work environment. Isolated and sporadic references to Williams as a "bitch," "aggressive," or a "legend in her own mind" do not meet this standard.

The Court does find, if true, reprehensible that a PHRC attorney hit Plaintiff and a prior supervisor threatened to hit her. Nevertheless, the timing and isolated nature of those differing incidents, occurring sporadically and involving different individuals, do not support a hostile work

environment as claimed by Plaintiff as they are not connected to the conduct of Stalczynski and Retort in the statutory period by nature or otherwise, despite her attempts to connect them by characterizing the discussed transfer as a plot to "harm" her. *Kegerise v. Susquehanna Twp. Sch. Dist.*, 1 CV 14-0747, 2015 WL 106528, at *10 (M.D. Pa. Jan. 7, 2015) ("If true, Rawls's physical threat and his three-white-bitches comments are deplorable. However, the physical threat was only made once, and over four years before Plaintiff alleged she was constructively discharged, so it cannot be the basis of a constructive discharge claim. The three-white-bitches comments, profane references and yelling were at most offensive utterances that are not severe or pervasive enough."). The complained of conduct as a whole, viewed under the totality of the circumstances does not rise to the necessary level of severity or persistence to create a hostile work environment.

### iii.    Constructive Discharge

> To establish constructive discharge, appellants must show that "'the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.' " *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1084 (3d Cir. 1996) *(quoting Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 888 (3d Cir.1984))

*Harris v. Cobra Const.*, 273 F. App'x 193, 196 (3d Cir. 2008).   The United States Supreme Court in *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), explained:

> Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?

542 U.S. at 146.   The Court further observed in *Suders*,

> The constructive discharge here at issue stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment. For an atmosphere of sexual harassment or hostility to be actionable, we reiterate, [ … ], the offending behavior "must be sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quotation marks and brackets omitted). A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. See, *e.g., Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1160 (C.A.8 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, ... the facts alleged [for constructive discharge must be] ... so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1015 (C.A.7 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

542 U.S. at 146-47.

Hence, Williams' subjective perception of her workplace does not govern. Further,

[w]e employ an objective test and thus an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge. In determining whether an employee was forced to resign, we consider a number of factors, including whether the employee was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations.

*Mandel*, 706 F.3d at 169-70 (internal citations omitted). In order to survive summary judgment regarding constructive discharge, then, "the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Spencer v. Wal–Mart Stores, Inc.,* 469 F.3d 311, 317 n. 4 (3d Cir. 2006). Calling for a plaintiff's resignation may be supportive of a constructive discharge claim, *see Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1161 (3d Cir. 1993) (finding no constructive discharge where plaintiff has a contract and the calls are being made by only two members of the nine-member Board), but discussing a potential transfer would not be, even if inadvertently overheard by Plaintiff. Williams' evidence falls far short of this standard.

In sum, the Court determines that the evidence as to harassment based on sex and/or race in the record is not sufficiently severe or pervasive so as to alter Williams' work conditions as required under Title VII. In this Court's estimation, viewing the facts in a light most favorable to Williams, a reasonable jury could not conclude that Williams was subjected to sufficiently severe or pervasive harassment based on race or sex so as to alter the terms and conditions of the employment of a reasonable person. Further, the Court also determines that there is insufficient evidence to establish that Williams was constructively discharged. A reasonable person facing the workplace situation to which Williams was subject would not have been compelled to quit her employment.

VI.     CONCLUSION

Based on the foregoing, Defendants Motion for Summary [43] will be GRANTED. An appropriate order follows.


                                        _s/Nora Barry Fischer_____
                                        Nora Barry Fischer
                                        United States District Judge

Dated: November 21, 2016

cc/ecf: All counsel of record.